**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TIMOTHY WADE, <br><br> *Plaintiff*, <br><br> v. <br><br> FIONTA, INC., <br><br> *Defendant*. | Civil Action No. 23‑1527 (SLS) <br> Judge Sparkle L. Sooknanan |

**MEMORANDUM OPINION**

Timothy Wade worked for Fionta, Inc., a consulting firm, for about five short months before Fionta fired him. Mr. Wade sued Fionta for discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and the D.C. Human Rights Act (DCHRA). Mr. Wade, who describes himself as an African American homosexual male, alleges that he was bullied, harassed, and ultimately fired because of his race, sex, and sexual orientation. Fionta now seeks summary judgment under Federal Rule of Civil Procedure 56. The Court takes seriously Mr. Wade's allegations that he was treated unfairly at Fionta. But the record does not support violations of the relevant statutes. Accordingly, the Court must grant Fionta's motion and enter summary judgment.

**BACKGROUND**

**A.      Factual Background**

The Court draws the facts from the Parties' Statements of Material Facts and the underlying materials referenced in those statements. *See* Def.'s Statement of Undisputed Material Facts (DSOF), ECF No. 24-2; Pl.'s Statement of Genuine Issues of Material Facts in Dispute (PSOF), ECF No. 29-1. The Court assumes the facts in those statements to be true unless they have been

specifically disputed, and it assumes the truth of other undisputed statements in the record. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

Fionta is a consulting firm that serves nonprofit organizations and associations. Compl. ¶ 13, ECF No. 1. In October 2017, Mr. Wade—who is an African American homosexual male, DSOF ¶¶ 1–2—interviewed with several firm officials for a Technical Architect position at Fionta, Opp'n Ex. 1 at 35:3–36:12, 37:21, ECF No. 30-1; DSOF ¶¶ 1–2. At the end of the interview, one of those officials, Josh Darrin, told Mr. Wade that he would be a better fit for a Salesforce Consultant position than for a "technical or tech lead role." Opp'n Ex. 1 at 41:20–42:2. The Technical Architect role involved supervisory responsibilities, whereas the Salesforce Consultant position did not. *Id.* at 25:5–10, 34:12–13. After the interview, Fionta offered Mr. Wade the Salesforce Consultant position, and he accepted. *Id.* at 75:4–10.

### 1.    Incidents at Fionta

Mr. Wade began working at Fionta in November 2017. *See* Opp'n Ex. 5 at P00170, ECF No. 30-5. The incidents at the core of this case occurred about three months later. On February 12, 2018, Mr. Darrin called Mr. Wade into his office, along with another Salesforce Consultant, Eli Nesson. DSOF ¶ 14; Opp'n Ex. 8, ECF No. 30-8. Mr. Wade's line manager, Al Scott, was also present. DSOF ¶ 14; Opp'n Ex. 8. They discussed a recent error by Fionta that caused a large number of emails to be sent to a client. DSOF ¶ 16; Opp'n Ex. 8. Both Mr. Scott and Mr. Nesson suspected at the time that the error was related to work by Mr. Wade. DSOF

---

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). Fionta contends that Mr. Wade's statement is inadequate and that all of the facts asserted in its statement should be deemed admitted. Reply 1–3, ECF No. 32. Although the Court did not find Mr. Wade's statement particularly helpful, it declines to say more about the sufficiency of that document, especially because it ultimately grants Fionta's Motion for Summary Judgment.

¶¶ 17–18; Opp'n Ex. 8. Mr. Darrin began the meeting by questioning Mr. Wade in a manner that was "obviously accusatory." Opp'n Ex. 8. He "yelled at" Mr. Wade for two to three minutes, DSOF ¶ 15; PSOF ¶ 9, while pointing at him "aggressively" and turning red, Opp'n Ex. 1 at 347:6–13. Mr. Nesson tried to explain that Mr. Wade's role in the mistake was "minimal" and that "at least the bulk of the responsibility for the error" was his. Opp'n Ex. 8. Although Mr. Darrin eventually "let up a bit," *id.*, he continued yelling at Mr. Wade "even when Mr. Nesson admitted" to the error, PSOF ¶ 9. In fact, the error turned out to be "entirely" Mr. Nesson's fault. Opp'n Ex. 8.

The second incident occurred the next day, February 13, 2018. Mr. Darrin again called Mr. Wade into his office to discuss an assignment. Opp'n Ex. 1 at 143:1–17. He began "yelling" at Mr. Wade in a "very aggressive" manner, telling Mr. Wade that the document he created was "too pretty" and insubstantial. *Id.* at 144:5–15, 145:10–13, 147:6; DSOF ¶ 9. He was "very red" and had "his fingers in [Mr. Wade's] face." Opp'n Ex. 1 at 147:3–4. When Mr. Wade tried to respond, Mr. Darrin interrupted him and banged his fist on a desk. *Id.* 149:5–11. The incident lasted between two and five minutes. *Id.* at 149:20–21; DSOF ¶ 8. During this incident, Mr. Darrin did not refer to Mr. Wade's race, gender, or sexuality. Opp'n Ex. 1 at 148:10–22.[2]

On February 15, 2018, a different manager at Fionta, Natalie Dudhat (then called Natalie Murchinson), emailed Mr. Wade and asked to speak on the phone, observing that his "workload

---

[2] There is some confusion about which of these incidents occurred on February 12 and which occurred on February 13. The Complaint alleges that the meeting with Mr. Scott and Mr. Nesson occurred on February 13, Compl. ¶ 27, ECF No. 1, which is consistent with Mr. Nesson's deposition testimony, Opp'n Ex. 2 at 90:17–22, ECF No. 30-2. But when deposed, Mr. Wade said that he mixed up the dates in his Complaint, and that this incident actually occurred on February 12. Opp'n Ex. 1 at 152:12–18, ECF No. 30-1. Fionta notes this discrepancy, DSOF at 1 n.1, ECF No. 24-2, but Mr. Wade does not, *see* Opp'n 3–4, ECF No. 30; PSOF ¶ 9, ECF No. 29-1. Because there appears to be no significance to the sequence of these incidents, the Court adopts Mr. Wade's deposition testimony for purposes of this motion.

ha[d] been light lately." Decl. Natalie Dudhat (Dudhat Decl.) Ex. D, ECF No. 24-8. Ms. Dudhat said that she wanted to "plan for a daily check-in" at which Mr. Wade would let her know "what work is on [his] plate for the day and the associated budget," and she would "then work on filling any gaps for the day." *Id.* Mr. Wade called Ms. Dudhat a couple hours later. Dudhat Decl. ¶ 10. During that phone call, Mr. Wade "complained" about the two incidents with Mr. Darrin. *Id.* He told Ms. Dudhat that he "was subjected to a hostile work environment" and that Mr. Darrin treated him "with hostility and aggression" because he "was the only gay black male in the office." Opp'n Ex. 3 at P00144, ECF No. 30-3; *see* Dudhat Decl. ¶ 10. Ms. Dudhat told Mr. Wade that his complaint would be investigated. Dudhat Decl. ¶ 13; Mot. Summ. J. Ex. 2 at 2, ECF No. 24-4; *see* Dudhat Decl. Ex. I, ECF No. 24-8.

That same day, Ms. Dudhat—joined by Fionta co-founder Jeffrey Sullivan—interviewed Mr. Nesson and Mr. Scott about the February 12 incident. Dudhat Decl. ¶ 11; Decl. Jeffrey Sullivan (Sullivan Decl.) ¶¶ 7–8, ECF No. 24-7. Mr. Nesson said that he thought Mr. Darrin's "tone" and "vibe" were "unnecessarily harsh towards Mr. Wade." Sullivan Decl. ¶ 9. He also said that Mr. Darrin had been "harsher" to a different employee (who was an Asian male) than "anyone else he had seen." *Id.* ¶ 10. Mr. Scott reported that "he did not get a sense" that Mr. Darrin "threatened" Mr. Wade, and that he thought that Mr. Darrin was exhibiting "aggravation." *Id.* ¶ 12. After these interviews, Fionta contacted its outside Human Resources consultants. Dudhat Decl. ¶ 12.

The next day, February 16, 2018, Mr. Sullivan gave Mr. Darrin a memorandum titled "Inappropriate Workplace Behavior and Corrective Action." Sullivan Decl. ¶ 13. The memorandum stated that Mr. Wade had reported "[m]ultiple incidents" when Mr. Darrin's "communications and interactions" with Mr. Wade had been "inappropriate and contributed to a

4

hostile work environment that is not acceptable." Sullivan Decl. Ex. E, ECF No. 24-7. It further stated that "[o]ther employees ha[d] reported feeling uncomfortable in interactions" with Mr. Darrin. *Id.* The memorandum directed "immediate corrective action," including prohibiting Mr. Darrin from working at the Fionta office, reassigning Mr. Darrin's direct reports, and scheduling a mediation session between Mr. Wade and Mr. Darrin. *Id.*

A week later, Mr. Sullivan issued a performance improvement plan for Mr. Darrin. Sullivan Decl. Ex. F, ECF No. 24-7. That plan reiterated that Mr. Darrin's concerning behavior "w[ould] no longer be tolerated," including his failure to "[d]emonstrat[e] equal respect to all employees regardless of race, gender, sexual orientation, or workplace tenure, or other identities or distinctions." *Id.* Under that heading, the plan referenced Mr. Darrin's "unequal treatment by Tim in a meeting." *Id.* The plan informed Mr. Darrin that his "performance w[ould] be closely monitored" for the next month. *Id.*

Mr. Wade says that, around this time, he had a meeting with Ms. Dudhat and Mr. Sullivan. Opp'n Ex. 3 at P00144. Mr. Sullivan apologized for the events that occurred and asked what Mr. Wade thought the resolution should be. *Id.* Mr. Wade suggested that he could work from home when Mr. Darrin was in the office, but Mr. Sullivan refused. *Id.* According to Mr. Wade, Mr. Sullivan said that if Mr. Wade did not wish to work with Mr. Darrin, Mr. Sullivan would "simply get rid of both of [them]." *Id.* Mr. Wade asked if his job was on the line, and Mr. Sullivan responded "Yes." *Id.*

Soon after, Fionta fired Mr. Darrin. DSOF ¶ 52. It did so "because of his treatment of Mr. Wade." Sullivan Decl. ¶ 22; *see* DSOF ¶ 52. Fionta almost immediately re-hired Mr. Darrin as a consultant "on a transition basis" because it needed his expertise to complete an ongoing

project. *See* Sullivan Decl. ¶ 23. But Mr. Darrin never returned to the office and Mr. Wade never interacted with him after the two incidents in mid-February. *Id.*; Mot. Summ. J. Ex. 2 at 2.

### 2.    Work Performance and Termination

As noted above, around the time of the incidents at issue, managers at Fionta were making efforts to address Mr. Wade's light workload. At the end of January 2018, Ms. Dudhat told Fionta's co-founders, Mr. Sullivan and Lisa Rau, that Mr. Wade had averaged 11% billable hours for the first three weeks of January, compared to 44% and 31% for two of his peers. Dudhat Decl. Ex. A, ECF No. 24-8. On February 12 (the day of the first incident with Mr. Darrin), Ms. Dudhat emailed some Fiona higher-ups, informing them that Mr. Wade "d[id] not have enough work this week" and asking if they had clients he could do work for. Dudhat Decl. Ex. B, ECF No. 24-8. The next day (the day of the second incident), Ms. Dudhat emailed other Fionta managers to ask for work for Mr. Wade and another employee, who "need[ed] billable work." Dudhat Decl. Ex. C, ECF No. 24-8. And as already mentioned, on February 15, Ms. Dudhat asked for a meeting with Mr. Wade to discuss his "light" workload—this is the meeting at which Mr. Wade first reported Mr. Darrin's conduct. *See* Dudhat Decl. Ex. D, ECF No. 24-8.

While Fionta management investigated the incidents involving Mr. Darrin, Mr. Wade's managers continued to focus on his workload. *See* DSOF ¶ 103. On February 22, 2018, Ms. Dudhat noted to another manager that Mr. Wade "has no work tomorrow." Dudhat Decl. Ex. M, ECF No. 24-8. About a week later, Ms. Dudhat emailed Mr. Wade, directing him to "try to get ahead of mornings wherein [he doesn't] have work" and that she would "prioritize finding work" for him. Dudhat Decl. Ex. Q, ECF No. 24-8. A week after that, Mr. Wade reported needing "roughly 5 hours of work" that day, which Ms. Dudhat tried to help fill. Dudhat Decl. Exs. T, U,

ECF No. 24-8. According to Ms. Dudhat, "Mr. Wade failed to consistently email [her] in the evenings when he had insufficient work the next day." Dudhat Decl. ¶ 23.

Some personnel at Fionta also expressed concerns about the quality and speed of Mr. Wade's work. *See* DSOF ¶¶ 91–92, 101. After Mr. Wade completed one task in late February, a Fionta manager went to Ms. Dudhat to "express frustration and confusion" that the task had taken Mr. Wade longer than anticipated. Dudhat Decl. Ex. R, ECF No. 24-8. And Ms. Rau attests that Mr. Wade was "by far[] the poorest performer of the Salesforce Consultants on his team while receiving the highest salary." Decl. Lisa Rau (Rau Decl.) ¶ 12, ECF No. 24-9. According to Ms. Rau, "Fionta was concerned about Mr. Wade's performance, lack of billing, and low output prior to February 15, 2018." *Id.* ¶ 13.

On March 19, 2018, Mr. Sullivan and Ms. Rau decided to fire Mr. Wade. Rau Decl. ¶ 34; Sullivan Decl. ¶ 25. Mr. Wade was fired that same day. Mot. Summ. J. Ex. 2 at 2. According to Ms. Rau, they made that decision because of Mr. Wade's "chronic lack of billable hours." Rau Decl. ¶ 35. When Fionta fired Mr. Wade, he was told that the reason was "lack of work." Mot. Summ. J. Ex. 2 at 2. Around that time, Fionta also fired two other consultants. *See* DSOF ¶¶ 106–07.

In August 2018, Mr. Wade filed a Charge of Discrimination with the District of Columbia Office of Human Rights and the Equal Employment Opportunity Commission (EEOC), alleging discrimination on the basis of race, sexual orientation, and sex. Charge of Discrimination (Charge) at 1, ECF No. 24-3. He described the incidents that occurred on February 12 and 13, and he also alleged that his firing was retaliation for reporting Mr. Darrin's conduct. *Id.*

### B.    Procedural Background

Mr. Wade sued Fionta in May 2023, asserting discriminatory-treatment claims, hostile work environment claims, and retaliation claims under Title VII and the DCHRA. Compl. ¶¶ 43–137. After discovery, Fionta moved for summary judgment against Mr. Wade. Mot. Summ. J., ECF No. 24. That motion is fully briefed and ripe for review. *See* Opp'n, ECF No. 30; Reply, ECF No. 32.

### LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Est. of Parsons*, 651 F.3d at 123. "Courts must avoid making credibility determinations or weighing the evidence, since credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Rothberg v. Xerox Corp.*, No. 12-cv-617, 2016 WL 10953882, at *10 (D.D.C. Feb. 3, 2016) (cleaned up) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

150–51 (2000)). But a court may "evaluate an inadequately supported assertion of material fact and deem it not materially disputed." *Id.* "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## DISCUSSION

Mr. Wade presses three kinds of claims under Title VII and the DCHRA: (1) discriminatory treatment claims, (2) hostile work environment claims, and (3) retaliation claims. The Court will discuss each in turn.

### A.      Discriminatory Treatment

Mr. Wade asserts that Fionta discriminated against him based on race, sex, and sexual orientation in violation of Title VII and the DCHRA. None of these claims survive summary judgment.[3]

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e–2(a)(1)). Similarly, the DCHRA "prohibits any employer or educational institution from discriminating on the basis of 'race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities,

---

[3] In their briefing, the Parties do not distinguish among Mr. Wade's different claimed bases for discrimination—race, sex, and sexual orientation. The Court follows the Parties' lead and analyzes Mr. Wade's discriminatory treatment claims jointly.

genetic information, disability, matriculation, or political affiliation of any individual[.]'" *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 40 (D.D.C. 2009) (alteration in original) (quoting D.C. Code § 2–1402.11(a)). Under both Title VII and the DCHRA, the "two essential elements" for a discriminatory treatment claim are that "(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability.'" *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 596 (D.C. Cir. 2025) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008)); *Strong v. Fort Myer Constr. Corp.,* No. 25-cv-1011, 2025 WL 2643457, at *2 n.2 (D.D.C. Sept. 15, 2025*)* ("In addressing employment discrimination claims brought under the DCHRA, 'courts look to the jurisprudence surrounding Title VII[.]'" (quoting *Burt v. Nat'l Republican Club of Capitol Hill*, 828 F. Supp. 2d 115, 122 (D.D.C. 2011))).

On the second element, when a plaintiff "lacks direct evidence of discriminatory decision-making, courts evaluate Title VII disparate treatment claims using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 252 (D.D.C. 2022). That framework operates in three steps. First, "the plaintiff must . . . establish a *prima facie* case of discrimination" by alleging that "he is a part of a protected class under Title VII, he suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Id.* (alterations adopted) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015)). If the plaintiff does so, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 253 (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016)). Finally, if the employer articulates such a reason, "the burden then shifts back to the plaintiff," *id.*, who "may defeat summary judgment by proving either that the defendant's legitimate, nondiscriminatory

10

reason is a pretext for discrimination, . . . or that the employment action was motivated by discrimination in addition to the proffered legitimate reason," *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 188 (D.D.C. 2014).

"[O]nce the employer asserts a legitimate, nondiscriminatory reason, the question whether the employee actually made a prima face case is no longer relevant and thus disappears and drops out of the picture." *Wheeler*, 812 F.3d at 1114 (alteration in original) (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008)). In that situation, the "one central inquiry" is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Id.* (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)).

Here, Mr. Wade argues that he suffered three adverse employment actions during his tenure at Fionta: (1) being hired as a Salesforce Consultant despite initially interviewing for a Technical Architect position, (2) being inappropriately berated by Mr. Darrin in February 2018, and (3) being fired. Opp'n 10. The first and third incidents are doubtlessly the kinds of actions that can support a discriminatory treatment claim. *See* 42 U.S.C. § 2000e–2(a)(1) (forbidding employers "to fail or refuse to hire or to discharge any individual" for a prohibited reason); D.C. Code § 2–1402.11(a)(1)(A) (same). But Mr. Darrin's inappropriate treatment of Mr. Wade at the two meetings in February 2018 does not constitute "discriminat[ion] against" Mr. Wade "with respect to his compensation, terms, conditions, or privileges of employment" within the meaning of Title VII or the DCHRA. 42 U.S.C. § 2000e–2(a)(1); D.C. Code § 2–1402.11(a)(1)(A). "[N]ot everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment.'" *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (en banc).

11

And getting yelled at twice by a higher-up—especially when that higher-up is consequently fired—is not sufficient. *See Muldrow*, 601 U.S. at 354 (noting that decisions implicating "the what, where, and when" of an individual's employment affect the employment's terms and conditions).

A contrary rule would be inconsistent with the standard applied to hostile work environment claims. As discussed below, proving such a claim requires a plaintiff to "show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In that context, "a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1129, 1134 (D.C. Cir. 2002) (adopting the district court's reasoning). Permitting such isolated incidents, like the ones proffered by Mr. Wade here, to constitute an adverse employment action supporting a discriminatory treatment claim would make hostile work environment claims entirely redundant. *See Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview.").

Accordingly, only Mr. Wade's hiring and firing can support his discriminatory treatment claims. The Court turns next to addressing whether those claims survive summary judgment.

### 1.    Discrimination in Hiring

Mr. Wade contends that a reasonable jury could conclude that Fionta's decision to hire him as a Salesforce Consultant rather than a Technical Architect was discriminatory. Opp'n 10. The Court disagrees. Fionta asserts that it hired Mr. Wade as a Salesforce Consultant because the officials who interviewed him believed that he "was not qualified to be a technical lead." Reply 8. Because Fionta has asserted this "legitimate, nondiscriminatory reason" for firing Mr. Wade, the "relevant inquiry" is whether Mr. Wade has "produced sufficient evidence for a reasonable jury to

12

conclude that [Fionta's] asserted nondiscriminatory reason for" declining to hire him as a Technical Architect "was not the actual reason, and that instead [Fionta] was intentionally discriminating against [Mr. Wade] on account of [his] race," sex, or sexual orientation. *Wheeler*, 812 F.3d at 1114 (quoting *Brady*, 520 F.3d at 493). Mr. Wade has failed to carry that burden. His Opposition identifies no record evidence supporting that Fionta's proffered explanation is pretextual. *See* Opp'n 10. And Ms. Rau, one of Fionta's co-founders, has attested that "all" of the officials who interviewed Mr. Wade "agreed that [he] was not qualified" for the Technical Architect position. Rau Decl. ¶ 5. Without any evidence suggesting that the hiring officials considered Mr. Wade's protected characteristics in making the hiring decision, Mr. Wade's claims based on that decision cannot proceed.[4]

### 2.    Discrimination in Firing

Mr. Wade's remaining discriminatory treatment claims hinge on his firing. Fionta says that it fired Mr. Wade because it lacked "billable work" for him. Mem. Supp. Mot. Summ. J. (Mot.) 32, ECF No. 24-1; Reply 13. Given this "legitimate, nondiscriminatory reason" for firing Mr. Wade, the inquiry again reduces to whether Mr. Wade has "produced sufficient evidence for a reasonable jury to conclude that" Fionta fired Mr. Wade on account of his protected characteristics. *Wheeler*, 812 F.3d at 1114 (quoting *Brady*, 520 F.3d at 493).

---

[4] Fionta also argues that Mr. Wade cannot bring a discriminatory-hiring claim because he failed to exhaust such a claim in his Charge of Discrimination. Reply 7. It is true that "Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). The DCHRA, however, "is bereft of any exhaustion requirement." *Viardo v. Families USA Found., Inc.*, No. 25-cv-1603, 2025 WL 2336223, at *3 (D.D.C. Aug. 13, 2025). Although an employee with a DCHRA claim "may file a complaint with the D.C. Office of Human Rights," the employee may also "file a private cause of action in a court of competent jurisdiction." *Id.* at *2 (quoting D.C. Code § 2–1403.16(a)). Because Fionta is entitled to summary judgment on this hiring claim under both Title VII and the DCHRA regardless of whether Mr. Wade exhausted it, the Court declines to address whether the claim was properly exhausted.

Mr. Wade argues that a jury must hear these claims because there is record evidence supporting three propositions: (1) that Fionta treated Mr. Wade worse than other employees, (2) that Fionta's explanation for firing Mr. Wade has shifted over time, and (3) that Fionta fired Mr. Wade shortly after the incidents in February 2018. Opp'n 13–14. The Court concludes that the record evidence is insufficient to permit Mr. Wade's claim to survive summary judgment.

*Worse treatment*. Mr. Wade contends that a jury could conclude that his firing was discriminatory because Fionta treated him worse than employees without his protected characteristics. Opp'n 13. "[A] plaintiff may support an inference of discrimination with a showing that the employer treated the plaintiff differently than similarly situated employees outside the protected class." *Ruppe v. Blinken*, 743 F. Supp. 3d 1, 20 (D.D.C. 2024). Here, however, Mr. Wade "has not made such a showing." *Id.*

Mr. Wade first relies on Mr. Darrin's conduct in February 2012. Opp'n 11. He suggests that Mr. Darrin treated him harshly and aggressively, which is unlike how Mr. Darrin treated others. *Id.* But there is no evidence that Mr. Darrin played any role in Mr. Wade's firing. Thus, there is no evidence connecting any discriminatory attitude harbored by Mr. Darrin to Fionta's decision to fire Mr. Wade. *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079–80 (D.C. Cir. 1999) (concluding that an employee's discriminatory remark was insufficient to save a claim from summary judgment when there was no evidence that the employee influenced the decision to fire the plaintiff).

Next, Mr. Wade points to Fionta's treatment of an employee hired after Mr. Wade was fired, Katherine Onderdonk, as evidence that Fionta's proffered explanation is pretextual. Opp'n 9, 13. He argues that Fionta retained Ms. Onderdonk despite her having billable-hour percentages (which the Parties refer to as "utilization") that were similar to Mr. Wade's. *Id.* The record reflects

that Ms. Onderdonk's utilization rates for her first five months at Fionta were 28.1%, 43.5%, 16.5%, 28.2%, and 91.3%. Opp'n Ex. 9 at P00199, ECF No. 30-9. By contrast, Mr. Wade's utilization rates during his five months at Fionta were 5%, 8.2%, 21%, 38%, and 15.8%. Rau Decl. Ex. B at FIONTA-002748, ECF No. 24-9. These metrics reflect that, in fact, Mr. Wade billed a notably lower percentage of hours than did Ms. Onderdonk in the months after Fionta hired each employee.

Further, Mr. Wade's argument misses that he was not the only employee that Fionta fired in the spring of 2018. Around that time, Fionta fired two other consultants. DSOF ¶¶ 106–07. One of them was an Asian man whose career average utilization was the second lowest at Fionta (after Mr. Wade). Opp'n Ex. 9 at P00198. The other was a white man who ranked fifth lowest in utilization. *Id.* Fionta explains that around this time, the company was losing money and had suffered its worst quarter in years. DSOF ¶ 109. One Fionta co-founder noted that although "there was work on the horizon, there was not a lot of work to go around," meaning that it was "hard[] to retain employees who d[id] not produce." Rau Decl. ¶ 28. The Court recognizes that "whether two employees are similarly situated is ordinarily a question of fact for the jury." *Wheeler*, 812 F.3d at 1116. But Mr. Wade's Opposition articulates no reason why a reasonable jury would conclude that Fionta's retention of Ms. Onderdonk reflects discrimination when the company fired other consultants with low utilization metrics—who did not share Mr. Wade's protected characteristics—around the same time that it fired Mr. Wade.

*Shifting explanation*. Mr. Wade next argues that Fionta's explanation for firing him has changed over time, which supports concluding that Fionta's explanation is pretextual. Opp'n 13. The D.C. Circuit has recognized that "shifting and inconsistent justifications" for an adverse employment action can be "probative of pretext." *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir.

2011) (quoting *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001)). Here, Mr. Wade perceives Fionta's explanation to have shifted from the company not having enough work to Mr. Wade not meeting utilization requirements. Opp'n 13. But this argument's premise is faulty because no reasonable jury could agree that Fionta has changed its reason for firing Mr. Wade. As both Mr. Wade and Fionta agree, the explanation given when Fionta fired Mr. Wade was a "lack of work." Mot. Summ. J. Ex. 2 at 2; Opp'n 13; Reply 14. Mr. Wade does not identify when or where Fionta said that Mr. Wade was fired "because he was not meeting his utilization requirements." Opp'n 13. He might have in mind Fionta's focus on his utilization metrics in its Motion for Summary Judgment, *see* Mot. 29, or perhaps Ms. Rau's comment about Mr. Wade's "chronic lack of billable hours," Rau Decl. ¶ 35. But throughout both its Motion for Summary Judgment and its Reply, Fionta has consistently stated that it fired Mr. Wade for a lack of work. Mot. 32; Reply 20–21. And regardless, Mr. Wade does not explain why a reasonable jury would consider a lack of work for an employee to be any different from an employee lacking billable hours. *See* Reply 20 (arguing that "inadequate utilization[] and not enough work[] essentially mean the same thing").

Mr. Wade also argues that Fionta hiring Ms. Onderdonk belies its assertion that a lack of work justified his firing. Opp'n 13. He points to evidence suggesting that Fionta hired Ms. Onderdonk as a Salesforce Consultant one month after firing Mr. Wade. Opp'n Ex. 9 at P00198–99. Even viewing that evidence in the light most favorable to Mr. Wade, it does not discredit Fionta's stated explanation for the firing. The record reflects that in the several weeks leading up to Mr. Wade's termination, managers at Fionta consistently sought to find work for him and expressed concern about his light workload. *See, e.g.*, Dudhat Decl. Exs. B, C, D, M, Q, T, U; DSOF ¶ 103. And as discussed above, at that time, Fionta was losing money and fired two other

16

consultants with low utilization metrics alongside Mr. Wade. DSOF ¶¶ 106–07, 109. In that context, the fact that Fionta then hired Ms. Onderdonk does not undercut that its inability to find work for Mr. Wade drove its decision to fire him.[5]

*Temporal proximity*. Finally, Mr. Wade argues that "[m]ost telling of all" is that all of the relevant actions occurred within a short period of time. Opp'n 13–14. Specifically, he notes that Mr. Darrin yelled at him in February 2018, and that he was fired a month later. *Id*. But Mr. Wade does not identify any record evidence connecting his firing to the incidents in February 2018. So the Court sees no reason why these events occurring within a month supports a jury finding that Mr. Wade's firing was discriminatory.

*    *    *

Considering "all the evidence in its full context," Mr. Wade has failed to meet "his burden of showing that a reasonable jury could conclude" that his firing was discriminatory. *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998). The Court understands that Mr. Wade believes

---

[5] In its Reply, Fionta argues that Mr. Wade cannot rely on the company hiring Ms. Onderdonk to support his claims of discrimination because he failed to mention Ms. Onderdonk in his Charge. Reply 7. This misconceives the administrative exhaustion doctrine. To bring a lawsuit, a plaintiff must have exhausted any "claims" they assert by including them in a charge of discrimination before the EEOC. *Hernández v. Mao*, 235 F. Supp. 3d 172, 177 (D.D.C. 2017) (quoting *Park*, 71 F.3d at 907). That does not mean, however, that a plaintiff is limited to proving their claims using only facts alleged in the charge.

Fionta also relies on a supplemental declaration attached to its Reply to dispute Mr. Wade's characterization of Ms. Onderdonk's hiring. Courts in this District "have considered supplemental declarations submitted during . . . the motion for summary judgment . . . briefing process[]" when resolving summary judgment motions. *ACLU v. Fed. Bureau of Prisons*, No. 20-cv-2320, 2022 WL 1262112, at *2 n.2 (D.D.C. Apr. 28, 2022); *see also Discepolo v. U.S. Dep't of Just.*, No. 16-cv-2351, 2018 WL 6624360, at *6 (D.D.C. Nov. 15, 2018) (collecting cases from other jurisdictions). But here, Mr. Wade's argument fails even without considering Fionta's additional evidence, so the Court declines to rely on it. *See Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))).

17

that his firing was unfair because Fionta failed to communicate its expectations about billable hours or to assign him enough work. *See* Opp'n 8–9. Unfair as it might have been, "this Court declines, as it must, to serve as a super-personnel department that reexamines an entity's business decisions." *McGrath v. Clinton*, 674 F. Supp. 2d 131, 144 (D.D.C. 2009) (cleaned up). The Court must grant summary judgment to Fionta on Mr. Wade's discriminatory treatment claims.

### B.    Hostile Work Environment

Next up is Mr. Wade's hostile work environment claims under Title VII and the DCHRA. On the record before the Court, Fionta is entitled to summary judgment on these claims, too.[6]

A plaintiff may "establish a violation of Title VII by proving that the employer created or condoned a discriminatorily hostile or abusive environment." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 187–88 (D.D.C. 2012). "To prevail on a hostile work environment claim, a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment." *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (cleaned up). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201.

---

[6] "A claim for hostile work environment is recognized as a cause of action under the DCHRA." *Walston-Jackson v. CCA of Tenn., Inc.*, 664 F. Supp. 2d 24, 26 (D.D.C. 2009). "The elements of a hostile work environment claim under the DCHRA mirror the federal requirements." *Elam v. Bd. of Trs. of Univ. of D.C.*, 530 F. Supp. 2d 4, 21 n.7 (D.D.C. 2007). The Parties' arguments regarding Mr. Wade's hostile work environment claims do not distinguish between Title VII and the DCHRA, and the Court discusses them jointly as well.

18

Here, Mr. Wade again relies on the two incidents in February 2018. He says that those incidents made him "fear for his safety" and feel "humiliate[ed] and embarrass[ed]." Opp'n 16; PSOF ¶ 16. The Court does not doubt that a jury could agree that Mr. Wade held a "subjective belief that []he experienced a hostile work environment." *Jenkins v. District of Columbia*, 281 F. Supp. 3d 77, 87 (D.D.C. 2017). But to succeed on this claim, the jury must also find that the workplace was objectively hostile, as "judged 'from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Even assuming that a jury could reasonably conclude that there was "some linkage" between Mr. Darrin's conduct and Mr. Wade's protected characteristics, such a jury could not conclude that Mr. Darrin's conduct clears the "high bar for the types of behavior that create a hostile workplace." *Id.* at 87–88. Although Mr. Darrin's treatment of Mr. Wade was inappropriate and unprofessional, it was also "the kind of 'ordinary tribulation[] of the workplace' that does not give rise to a hostile workplace claim." *Uzoukwu v. Metro. Wash. COG*, 130 F. Supp. 3d 403, 415 (D.D.C. 2015) (alteration in original) (quoting *Franklin v. Potter*, 600 F. Supp. 2d 38, 76 (D.D.C. 2009)); *see also Knight v. Mabus*, 134 F. Supp. 3d 348, 356 (D.D.C. 2015) ("[O]ne occasion of yelling is insufficiently pervasive or severe to support a hostile work environment claim."). Simply put, "a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart*, 275 F.3d at 1129, 1134 (adopting the district court's reasoning). The Court must grant summary judgment to Fionta on these claims too.

### C.    Retaliation

Finally, Mr. Wade claims that Fionta violated Title VII and the DCHRA by firing him in retaliation for reporting Mr. Darrin's conduct. These claims also come up short.

Title VII "prohibits retaliation against an employee 'because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under [Title VII].'" *Salak v. Pruitt*, 277 F. Supp. 3d 11, 21 (D.D.C. 2017) (alterations in original) (quoting 42 U.S.C. § 2000e–3(a)). "A plaintiff who seeks to prove that he has been subjected to unlawful retaliation must show that (1) he engaged in activity that Title VII protects; (2) his employer took a materially adverse action against him; and (3) the employer took the action because of the protected activity." *Id.* "Evaluation of Title VII retaliation claims follows the same burden-shifting template as discrimination claims." *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). "First, a plaintiff must establish a prima facie case of retaliation; if she meets that burden, the employer must articulate a legitimate nonretaliatory reason for its action; finally, the plaintiff has the ultimate burden of establishing that the reason asserted by the employer is pretext for retaliation." *Id.*

Under the DCHRA, it is "an unlawful discriminatory practice to . . . retaliate against . . . any person . . . on account of having exercised or enjoyed . . . any right granted or protected under this chapter." *Simmons v. Langston Lane Ltd. P'ship*, No. 18-cv-2169, 2023 WL 2733975, at *5 (D.D.C. Mar. 31, 2023) (quoting D.C. Code § 2–1402.61(a)). The elements of a DCHRA retaliation claim are essentially the same as for a Title VII retaliation claim, and such DCHRA claims are also analyzed using the "familiar *McDonnell Douglas* framework." *Id.* That said, there is a notable difference between retaliation claims under Title VII and under the DCHRA:

> Unlike in the Title VII context, the DCHRA does not require that the employee show that retaliation was the "but for" cause of the adverse action. Instead, the employee can "prevail in [her] DCHRA claim 'by proving that [the employer's] actions were motivated in substantial part by retaliatory reasons, even if they were motivated also by legitimate business reasons.'"

20

*Savignac v. Day*, 754 F. Supp. 3d 135, 206 n.21 (D.D.C. 2024) (quoting *District of Columbia v. Bryant*, 307 A.3d 443, 452 (D.C. 2024)).

Fionta does not dispute that Mr. Wade's complaint to his manager about Mr. Darrin constitutes protected conduct, and it also does not dispute that Mr. Wade's termination was an adverse employment action. Mot. 25. Thus, the question is whether a reasonable jury could conclude that Fionta's termination of Mr. Wade was "because of the protected activity," *Salak*, 277 F. Supp. 3d at 21, or was "motivated in substantial part by retaliatory reasons," *Savignac*, 754 F. Supp. 3d at 206 n.21 (quoting *Bryant*, 307 A.3d at 452). On that score, the Parties' arguments are familiar. Fionta asserts that it fired Mr. Wade because it "did not have enough work" for him. Mot. 25. And Mr. Wade candidly admits that he "relies on the same theories and facts" as for his discriminatory treatment claims "to establish that Fionta's alleged legitimate, non-discriminatory reason for Mr. Wade's termination was in fact pretext for discrimination." Opp'n 19.

Given that many of the Parties' arguments regarding pretext are identical to those discussed above, the Court will not rehash that discussion here and will instead address only the new points made by the Parties.

First, Mr. Wade observes that between February 20 and March 16, 2018, his utilization reached 26%, which reflects that he "was performing billable work when he was assigned work." Opp'n 20; *see* Rau Decl. ¶ 29. But the portion of the record on which he relies clarifies that Mr. Wade reached that percentage "with a lot of direct attention" from Fionta higher-ups. Rau Decl. ¶ 29; *see also* Dudhat Decl. Exs. B, C, D, M, Q, T, U. The fact that Mr. Wade's workload remained flagging despite that direct attention supports rather than contradicts Fionta's asserted explanation. Although Mr. Wade may believe that the onus was on Fionta to assign him more work, that opinion does not indicate that retaliation played a substantial part in his termination.

21

Second, Mr. Wade again argues that the one-month gap between him reporting Mr. Darrin's conduct and his termination would permit a jury to conclude that Fionta's explanation is pretextual. A causal connection between an employee's protected activity and an adverse employment action "may be inferred by 'showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after the activity.'" *Pratt v. Pompeo*, 318 F. Supp. 3d 34, 39 (D.D.C. 2018) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). Here, however, a reasonable jury could not make that inference. The record indicates that Fionta management was concerned about and trying to correct Mr. Wade's "light" workload even before he reported Mr. Darrin's conduct. Dudhat Decl. Exs. C, D. And as the Court has already explained, the record confirms that Fionta remained focused on that problem up until it fired Mr. Wade. In the absence of other supporting evidence, the timing of Mr. Wade's termination, on its own, does not support an inference of retaliation. *Cf. Pinney v. Isaacman*, No. 19-cv-2259, 2026 WL 622255, at *13 (D.D.C. Mar. 5, 2026) ("That [the defendant's] issues with [the plaintiff's] attendance predate any protected activity cuts strongly against the suggestion that the later actions she took based on those issues were retaliatory.").

Third, Mr. Wade notes that after he was fired, he worked for another business that partnered with Fionta. Opp'n 21–22. While there, a manager told Mr. Wade that he had heard some "ramblings [sic] around something going on between [Mr. Wade] and Fionta," and Mr. Wade explained that he had sued Fionta. Opp'n Ex. 1 at 266:10–14. That business eventually fired Mr. Wade. *Id.* at 270:6–15. But Mr. Wade does not explain why this sequence of events supports his claim that Fionta retaliated against him for complaining about Mr. Darrin's conduct. *See* Opp'n 21–22. To the extent that Mr. Wade surmises that another business fired him because of what happened at Fionta, that is unsupported by any evidence in the record.

In sum, Mr. Wade has not identified evidence that would permit a reasonable jury to conclude that Fionta fired him in retaliation for complaining about Mr. Darrin's conduct. And the Court therefore must grant summary judgment to Fionta on this claim.[7]

## CONCLUSION

For the foregoing reasons, the Court grants Fionta's Motion for Summary Judgment, ECF No. 24.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:    April 2, 2026

---

[7] Because the Court grants summary judgment on Mr. Wade's claims, it need not address the Parties' arguments regarding Mr. Wade's duty to mitigate, his emotional damages, or other damages-related disputes. *See Hargrove v. Medstar Wash. Hosp. Ctr.*, No. 23-cv-3381, 2025 WL 2255424, at *3 n.1 (D.D.C. Aug. 7, 2025) ("[S]ince I will . . . grant summary judgment for defendants, I need not reach the damages issue.").